UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| THE STATE OF LOUISIANA through the | * | CASE NO. |
| COASTAL PROTECTION AND RESTORATION | * | |
| AUTHORITY BOARD, and | * | |
| COASTAL PROTECTION AND RESTORATION | * | |
| AUTHORITY, | * | JUDGE |
| | * | |
| Plaintiff, | * | MAGISTRATE JUDGE |
| | * | |
| v. | * | **COMPLAINT** |
| | * | |
| UNITED STATES DEPARTMENT OF THE ARMY, | * | |
| | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff, the State of Louisiana ("State"), through the Coastal Protection and Restoration Authority Board ("CPRA Board") and the Coastal Protection and Restoration Authority ("CPRA"), alleges as follows:

**PARTIES**

1.

Plaintiff is the State of Louisiana, appearing through the CPRA Board and CPRA, which are entities responsible for integrated coastal protection, including hurricane protection and storm damage reduction. *See generally* La. R.S. 49:214.5.1-5.8, for the structure, purpose, and authority of the CPRA Board and La. R.S. 49:214.6.1-6.10, for the structure, purpose, and authority of the CPRA; *see also* La. R.S. 49:214.2(11) for a definition of integrated coastal protection.

2.

The CPRA Board represents the State's position in policies relative to the protection, conservation, enhancement, and restoration of the coastal area of the State through oversight of integrated coastal protection projects and programs consistent with the legislative intent. La. R.S.

1

49:214.5.2(A)(1).  The CPRA Board is statutorily authorized to enter into agreements and contracts with the United States Department of the Army as the non-federal sponsor on behalf of the State. La. R.S. 49:214.1(F); La. R.S. 49:214.5.2(A)(7).

3.

CPRA is the implementation and enforcement arm of the CPRA Board and is directed by the policies set by the CPRA Board. La. R.S. 49:214.6.1(A)(2). CPRA is a body corporate with the power to sue and be sued, with its domicile in East Baton Rouge Parish, Louisiana. La. R.S. 49:214.6.1(A).

4.

Defendant is the United States Department of the Army ("Government"), a military department within the United States Department of Defense. The State, acting through the CPRA Board, and the Government entered a Project Partnership Agreement ("PPA") on September 22, 2008, which was subsequently amended on March 12, 2010.

**JURISDICTION AND VENUE**

5.

The Court has jurisdiction over this action under the Flood Control Act of 1970, Pub. L. No. 91-611, 84 Stat. 1818, 1831 (codified as 42 U.S.C. § 1962d-5b) ("Flood Control Act"), and 28 U.S.C. § 1331.  The Flood Control Act provides that "[e]very agreement entered into pursuant to this section shall be enforceable in the appropriate district court of the United States." Flood Control Act, § 221(c).

6.

Sovereign immunity is waived under the Flood Control Act, which waives sovereign immunity for actions involving enforcing agreements entered pursuant thereto.

7.

The United States District Court for the Eastern District of Louisiana is the "appropriate district court" for enforcement of the PPA under the Flood Control Act.  Flood Control Act, § 221(c).

8.

The Court has jurisdiction to hear a claim under the Administrative Procedure Act, 5 U.S.C. §§ 551, 701 *et seq.* ("APA"), pursuant to 28 U.S.C. §1331.

9.

An actual, present, and justiciable controversy exists between the State and the Government regarding whether the design and construction of the project at issue in this litigation are complete in accordance with the PPA and whether the State bears any responsibility now for the maintenance, repair, replacement, and rehabilitation of the defective and failing pumps. This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201(a) and 2022.

10.

The United States District Court for the Eastern District of Louisiana is the proper venue for this case under 28 U.S.C. § 1391(b)(2) because it is the district in which a substantial part of the events and omissions giving rise to the claims herein occurred and in which the property that is the subject of this action is situated.

**CLAIM FOR RELIEF**

11.

The State's case arises from the Government's breach of the PPA and amendments thereto, specifically for failures and defects in the design and construction of the Permanent Canal Closures and Pumps ("PCCPs") for the Lake Pontchartrain and Vicinity, Louisiana Project (the "PCCP Project").

12.

The design and construction of the PCCPs includes seventeen pumps, at three pump stations, at the three main outfall canals in the greater New Orleans area, specifically the 17th Street Canal, the London Avenue Canal, and the Orleans Avenue Canal, with a total pumping capacity of 24,300 cubic feet per second ("cfs"). A design lifespan for the pumps is guaranteed for at least 35 years, with the goal to keep the greater New Orleans area dry during future hurricane events and other heavy rain events. Notably, the 17th Street Canal, the London Avenue Canal, and the Orleans Avenue Canal are the same canals with flood protection measures that failed during Hurricane Katrina, resulting in catastrophic and deadly flooding throughout the area.

13.

The PCCPs are part of a more extensive hurricane storm surge risk reduction system. The primary goals of the PCCP Project are to (1) replace interim closure structures on the three outfall canals; (2) ensure public safety by constructing storm surge risk reduction barriers to prevent a 100-year storm surge in Lake Pontchartrain from entering the three outfall canals; and (3) allow the Sewerage and Water Board of New Orleans to evacuate rainwater, unimpeded, from the city of New Orleans.

14.

On or about September 28, 2012, PCCP Constructors, a Joint Venture between Kiewit Louisiana Company, Traylor Bros., Inc., and M.R. Pittman Group in association with Stantec Consulting Services, Inc. ("Joint Venture Contractors"), was awarded the design-build contract by the Government for the construction of the PCCPs.

15.

The Government issued a Notice to Proceed on May 6, 2013, and construction began on May 10, 2013.

16.

Five years later, on May 1, 2018, the Government issued a Notice of Construction Completion for certain contractual features associated with the construction contract for the PCCPs, including the pumping stations.

17.

The State did not agree with the Notice of Construction Completion; specifically, CPRA did not agree that the Government met all its obligations under the PPA for the design and construction of the PCCPs and did not consider the PCCP Project to be complete, having noted such disagreement in writing via correspondence dated May 16, 2018. However, CPRA recognized that the Government did not have the capability to operate and maintain the pumping stations and thus agreed to take over the operation and maintenance while reserving all rights until such time the PCCP Project was officially considered complete and accepted by CPRA in accordance with the PPA. CPRA, in accordance with separate agreements and in accord with state law, turned over ultimate operation and maintenance to the non-federal partner local entities with

jurisdiction over the LPV and PCCP Projects, the Southeast Louisiana Flood Protection Authority-East (SLFPAE) and the Sewerage and Water Board of New Orleans (SWBNO).

18.

Three years later, the pumps began to fail despite pump specifications requiring a 35-year life span. As a result, pump one at the London Avenue Canal was taken out of service in July 2021, and on July 14, 2021, CPRA sent a Request for Technical Assistance to the Government.

19.

For several years, CPRA attempted to work in good faith with the Government, consultants, the Joint Venture Contractors, other contractors, and the manufacturer of the pumps to identify the cause(s) of the deficiencies and failures in the pumps as well as discuss potential remedies and permanent solutions to meet the required 35-year life span and total operating capacity of 24,300 cfs.

20.

Additional known deficiencies in the Government's design and construction are related to the climber screens installed on the PCCP Project, tilting of certain pump equipment, as well as sinkholes and basement cracks in certain areas that are part of the PCCP Project.

21.

The Government's design and construction deficiencies continue to render the pumps within the PCCPs insufficient to perform and fulfill the intended purposes. As a result, the city of New Orleans and surrounding areas, as well as the residents, are vulnerable to future flooding events.

22.

By this action, the State requests that this Court (1) find that the Government breached the PPA in its defective design and construction of PCCPs; (2) find that the Government breached the implied covenant of good faith and fair dealing; (3) find that the Government breached the implied warranty; (4) declare that the PCCPs are not complete as contracted for in the PPA and the Government's Notice of Construction Completion on May 1, 2018, is arbitrary, capricious, and an abuse of discretion, and contrary to law; and (5) determine through the judicial review of the final agency decision by the Government on May 1, 2018, that the PCCPs are complete and transferring the responsibility for operation, maintenance, repair, rehabilitation, and replacement to CPRA, is a legal wrong for which the State has been adversely affected, and must be set aside. Any efforts by the Government to transfer responsibility for the defective pumps to the State through CPRA are contrary to law and equity.

## ALLEGATIONS GIVING RISE TO THE CLAIM FOR RELIEF

23.

Section 204 of the Flood Control Act of 1965, Public Law 89-298, as amended prior to August 2005, authorized the Secretary of the Army to construct the Lake Pontchartrain and Vicinity, Louisiana Project for hurricane storm damage reduction in Southeast Louisiana ("Original Project").

24.

The Original Project consists of numerous hurricane protection features, including but not limited to approximately 133 miles of levees and floodwalls in St. Bernard, Orleans, Jefferson, and St. Charles Parishes, generally in the vicinity of New Orleans, between the Mississippi River and Lake Pontchartrain; floodproofed bridges; drainage structures; control structures; fronting

protection of pump stations; numerous pedestrian, highway, and railroad floodgates; and the segmented rock breakwater approximately 5 miles long along the western shore of Lake Pontchartrain adjacent to the Manchac Wildlife Refuge near Pass Manchac in St. James Parish for the purpose of marsh creation.

25.

The 1965-authorized Original Project was designed to protect the lowlands in the Lake Pontchartrain tidal basin within the greater New Orleans Metropolitan area from flooding by hurricane-induced sea surges and rainfall.

26.

On August 29, 2005, after the landfall of Hurricane Katrina in Louisiana, the flood-protection system for the city of New Orleans that held back the waters of Lake Pontchartrain and Lake Borgne became overwhelmed, and water overtopped and breached the levees that were part of the Government's Original Project. In some parts of the city, levees and sea walls were not tall enough to hold back the water; in others, floodgates did not close properly, and some flood-protection structures collapsed entirely. By August 30th, a large percentage of the city was underwater.

27.

The Government has authority under Public Law 84-89, Flood Control and Coastal Emergencies ("FC&CE"), 33 U.S.C. 701n (69 Stat. 186) for emergency management activities. Under the FC&CE, the Chief of Engineers, acting for the Secretary of the Army, is authorized to undertake activities including disaster preparedness, advance measures, emergency operations for flood response and post-flood response, rehabilitation of flood control works threatened or destroyed by flood, protection or repair of federally authorized shore protective works threatened

or damaged by a coastal storm, and provisions of emergency water due to drought or contaminated source.

28.

On December 30, 2005, Public Law 109-148, Department of Defense, Emergency Supplemental Appropriations to Address Hurricanes in the Gulf of Mexico, was enacted, modifying the Original Project and authorizing the Secretary of the Army, at full federal expense, to accelerate completion of the unconstructed portions of the Original Project. *See* FC&CE Chapter 3, Title I, Division B of the Public Law 109-148 and Chapter 3, Title III of Public Law 110-252.

29.

Additional Emergency Supplemental Appropriations Acts were enacted in 2006 and 2008, Public Law 109-234 and Public Law 110-252, further modifying the Original Project by authorizing the Secretary of the Army, at complete federal expense, to reinforce or replace existing floodwalls, as necessary, to improve the performance of the Original Project and to armor critical elements.  *See* FC&CE, Chapter 3. Title II of Public Law 109-234 (102 Stat. 454-455) and Chapter 3, Title III of Public Law 110-252 (collectively "FC&CE Supplements")

30.

The Original Project was further modified to authorize the Secretary of the Army to raise levee heights where necessary and otherwise enhance the Original Project to provide the level of protection necessary to achieve the certification required for participation in the National Flood Insurance Program (NFIP) ("Cost Shared Work Project").  *See* Construction heading, Chapter 3, Title II of Public Law 109-234 (120 Stat. 454) and under the Construction heading, Chapter 3, Title III of the Public Law 110-252 (collectively "Construction Supplementals").

## **THE PROJECT PARTNERSHIP AGREEMENT**

31.

Any Cost Shared Work Project with the Government and a non-federal sponsor, such as CPRA, requires a PPA, which is a legally binding agreement between the Government and a non-Federal sponsor (state, municipal government, flood control district, port authority, etc.) for the construction of a water resource project. The PPA describes the project and the responsibilities of the Government and non-federal sponsor in the cost-sharing and execution of the work.

32.

The Flood Control Act provides:

After the date of enactment of this Act, the construction of any water resources project by the Secretary of the Army, acting through the Chief of Engineers, or by a non-Federal interest where such interest will be reimbursed for such construction under the provisions of section 215 of the Flood Control Act of 1968 or under any other provision of law, shall not be commenced until each non-Federal interest has entered into a written agreement with the Secretary of the Army to furnish its required cooperation for the project.

Flood Control Act § 221(a).

33.

The Government and the CPRA Board entered a PPA on September 22, 2008, for a Cost Shared Work Project, specifically for the design and construction of the Original Project as modified by the above-mentioned FC&CE Supplementals and Construction Supplementals ("Modified Project").

34.

The PPA sets forth the responsibilities of CPRA and the Government concerning cost sharing, construction and operation, and maintenance of the Modified Project.

35.

The PPA establishes that the design and construction of the Modified Project is the responsibility of the Government. While the PPA provides CPRA with an opportunity to provide comments relating to failures or deficiencies in design and construction, the Government maintains exclusive discretion to make the final determination of whether a failure or deficiency exists.

36.

The PPA is clear that the Government has exclusive control of all contents of solicitations, awards for contracts, execution of contract modifications, issuance of change orders, resolution of contract claims, and performance of all work on the Modified Project (whether the work is performed under contract or by the Government personnel).

37.

The portion of the design and construction of the Modified Project that is at issue in this litigation is the design and construction of the PCCPs as added to the project through Amendment No. 1 to the PPA executed on March 12, 2010. This portion of the Modified Project, the PCCP Project, includes seventeen pumps at three pump stations at the three main outfall canals, specifically the 17th Street Canal, the London Avenue Canal, and the Orleans Avenue Canal, notably the same canals with flood protection that failed during Hurricane Katrina causing catastrophic and deadly flooding throughout the greater New Orleans area.  The purpose of PCCPs is to keep the greater New Orleans area dry during future hurricanes and other heavy rain events.

## DESIGN AND CONSTRUCTION OF THE PCCPs

38.

On February 14, 2013, the Government issued a "Request for Proposal" ("RFP") for the design and construction of the PCCPs, which included the following project objectives:

The Government seeks, through the solicitation and award of a Design-Build Contract, a remedy for hurricane protection related problem in the New Orleans area.  The goal is to provide protection of three canals (London Avenue, 17th Street, and Orleans Avenue) from the storm urge from Lake Pontchartrain, while not impeding the ability of the area's internal drainage system to function.  This includes design and construction of permanent gated storm surge barriers and pump stations at the discharge end of each canal, with pumps having stand-alone power supply capacity to operate independently of any publicly provided utility.  Each permanent canal closure and pump stations (PCCP) shall have capacity sufficient to evacuate the drainage fed to the canals by pumping it to the elevated level of Lake Pontchartrain.

RFP, p. 16, Section 1.0 Project Objectives.

39.

Per the specifications for the PCCP Project, the design operating capacities for the pumps required a total of 12,600 cfs for the 17th Street Canal, 2700 cfs for the Orleans Avenue Canal, and 9000 cfs for the London Avenue Canal for a total pumping capacity for all three canals of 24,300 cfs.  RFP, p. 116, Section 1.0 Project Objectives.

40.

Per the specifications for the PCCP Project, the design life for the pumps and drivers required a minimum of 35-year life span. RPF, p. 127, Section 3.1.10.

41.

On or about September 28, 2012, the Government awarded the Joint Venture Contractors the design-build contract to construct the PCCPs.

42.

The Government issued a Notice to Proceed on May 6, 2013, and construction began on May 10, 2013.

43.

Throughout the design and construction of the PCCPs, representatives of CPRA expressed concerns regarding the potential for corrosion in the design and construction of the pumps. These concerns included the use of dissimilar metals and inadequate cathodic protection for the electrically continuous pumps, all of which could lead to corrosion. CPRA made these concerns known through the Government's online comment program known as "Dr. Checks," through written reports after onsite inspections, verbally at telephone conferences, emails, and other communications.

44.

CPRA also advised the Government that soil settlement could potentially cause the pumps to no longer be level and could adversely affect the operation of the pumps.

45.

Nonetheless, on May 1, 2018, the Government issued a Notice of Construction Completion, which stated, in part, that "[a] final inspection of the project was conducted on April 13, 2018, and all contract work was performed with the approved plans and specifications and meets the design criteria," and that "punch list items identified during the pre-final inspection have been corrected."

46.

The Notice of Construction Completion completely disregarded the punch list from a recent walk-through inspection held on April 30, 2018. During that inspection, CPRA echoed their previous concerns with the project, including whether the cathodic protection system met the design requirements, among other concerns.

47.

According to the provisions of the PPA, the Notice of Construction Completion triggers legal responsibility to shift the operation and maintenance of the PCCPs from the Government to CPRA.

48.

On May 16, 2018, CPRA responded to the Notice of Construction Completion, which stated, in pertinent part:

> The CPRA Board and the CPRA cannot agree to the NCC letter for Operation and Maintenance, Repair, Replacement, and Rehabilitation (OMRR&R) responsibilities for this portion of the LPV Project until these comments [PCCP NCC Letter of Response Comments and the April 30, 2018 CPRA Inspection Report are attached to the letter] are adequately addressed and the turnover thereof completed in accord with the provisions of the Project Partnership Agreement ("PPA") for the Project. Therefore, the CPRA Board and the CPRA do not consider issuance and receipt of the above referenced NCC letter as acceptance of said work and said letter should not be considered by the Corps as triggering any legal responsibility on the part of the CPRA Board, the CPRA, or the State's non-federal partners to undertake OMRR&R of the above referenced portion of the LPV Project.

> &ast;&ast;&ast;

> Nevertheless, as the CPRA Board is of the opinion that the Corps has no capability to fulfill OMRR&R on its own, the project needs to be maintained while the remaining turn-over issues are resolved. Consequently, the CPRA Board has agreed to have the State of Louisiana, through the statutorily responsible levee districts and levee authorities, carry out the O&M responsibilities while reserving all rights to seek reimbursement from the Corps for costs incurred up until such time as the project is officially complete and accepted by the CPRA Board in accord with the PPA. This O&M responsibility is being assumed solely to protect the citizens and property within the State of Louisiana.

## PCCP PROJECT DEFECTS AND FAILURES

49.

*Three years* after the Government's Notice of Construction Completion, a pump at the London Avenue Canal began to fail despite pump specifications requiring a 35-year life span.

14

50.

In July 2021, SLFPA-E notified state authorities of pump failure, specifically:

During June 2021 pump runs, SLFPA-E noticed that the lower diffuser bearing temps on Pump 1 at London Ave PCCP appeared to be running higher than normal, rising briefly to approximately 180°F. The condition has escalated during pump runs in June, and peaked during the July 7, 2021 pump run, where the bearing temperature on Pump 1 spiked suddenly and triggered the 200°F shutdown setpoint, shutting down the pump. While the pump was in the process of stopping, FPA noticed that the bearing temperature reached over 260°F before slowly decreasing.

51.

As a result, Pump 1 at the London Avenue PCCP was taken out of service, and on July 14, 2021, CPRA sent a Request for Technical Assistance to the Government.

52.

The pump manufacturer, Patterson Pump, initially stated after an investigation that settlement was the problem, causing Pump 1 to no longer be level. Mike Ellers of Patterson Pump opined that "settling has occurred to cause the pump to no longer be level…this movement is causing the pump shaft to no longer sit at a true vertical position and pushing against one side of the bearing…causing the bearing to spin."

53.

The Government determined that the bay holding the London Avenue PCCP, Pump 1, needed to be drained and the Pump 1 taken apart for a deeper inspection. The Government did not have the necessary equipment, and Lakey, Inc. was hired to perform those tasks.

54.

After dewatering Pump 1 in December of 2022, the disassembly of Pump 1 began in January of 2023. Lakey discovered significant and alarming amounts of corrosion in many areas of the pump components. The source of the original concern for the SLFPA-E, the lower diffuser

bearing, is one such area. Lakey noted that it could not find any original zinc primers on the pump pieces. Another USACE contractor, MARZ, found a similar lack of zinc primer on the pump components.

55.

On January 27, 2023, the on-site Patterson Pump representative described the corrosion on the lower diffuser as the worst he had ever seen. Only three of the twelve stainless steel bolts that held the lower diffuser in place remained. The housing threads that had housed the bolts were mostly missing due to heavy corrosion, causing eight of the twelve bolts to fall out of the housing to unknown locations.

56.

Subsequent reports by Lakey indicate that much of the corrosion was likely due to the use in the design and construction of incorrect type or dissimilar metals for the different pump components; dissimilar and incorrect metals used in the weld area; improper coatings (i.e., the initial coating inspection indicated that the discharge elbow was likely not primed with zinc primer before the coal tar epoxy was applied when newly manufactured); improper lubricants used on rubber gaskets causing deterioration in the rubber material; nicks, holes and cuts in the coating exposing metal; as well as other improper welding techniques.

57.

Additionally, during an inspection in January 2023, it was discovered that while anode beds (cathodic protection systems) are located at each PCCP, the anode beds were not connected to the pumps. Further, a concern expressed by the CPRA during the design and construction of the PCCPs was that even if the anode beds had been connected, the design location was too far away from the electronically continuous pumps to be an effective corrosion prevention measure. Lakey confirmed

that "damage is due to the pump being continuously submerged in brackish water with an ineffective coating system and w/o any supplemental cathodic protection."

58.

Subsequent investigations of additional pumps within the PCCPs at all three canal locations indicated similar deficiencies preventing those pumps from meeting the specified minimum 35-year lifespan. The PCCPs do not, and will not, have a total pumping capacity of 24,300 cfs as required by the design specifications over the next 35 years unless the deficiencies in the pumps are identified and the necessary repairs and/or replacement completed.

59.

Invetigations also indicated deficiencies in the Government's design and construction related to the climber screens installed on the PCCP Project, tilting of certain pump equipment, as well as sinkholes and basement cracks in certain areas that are part of the PCCP Project.

60.

CPRA has attempted to work in good faith with the Government, consultants, the Joint Venture Contractors, and the manufacturer of the pumps to identify the cause(s) of the deficiencies and failures of the pumps as well as discuss potential remedies and permanent solutions.

61.

 Despite many years of attempting to identify the underlying issue, develop a solution to the problem(s), as well as repair the deficiencies and failures in the design and construction of the pumps, the Government has failed to provide PCCPs with the required pumping capacity to 24,300 cfs and a 35-year lifespan.

62.

The Government's design and construction deficiencies render the pumps within the PCCPs insufficient to perform and fulfill their intended purpose.

## THE GOVERNMENT IS RESPONSIBLE FOR DAMAGES
## DUE TO THE DEFECTS IN DESIGN AND CONSTRUCTION

63.

Pursuant to PPA Article VIII, CPRA, through the Governor of the State of Louisiana, John Bel Edwards, provided written notice to the Government on April 21, 2023, identifying the nature of the breach and seeking in good faith to resolve the dispute through negotiation.

64.

The pumps are of the utmost importance to life and property in the greater New Orleans area. Unfortunately, the condition of the pumps continues to degrade as a direct result of the fault and negligence of the Government in the deficient design and construction of the PCCPs. This degradation of the pumps will continue until the deficiencies are remedied.

65.

The pumps require significant repair and/or replacement to make the PCCPs suitable for their intended use.

66.

The State has incurred and will continue to incur substantial damages due to the Government's failure to fulfill its contractual obligation.

67.

The State has lost the benefit of the federal funds and local and state maintenance funds expended on PCCPs.

68.

The State, through the CPRA Board and CPRA, has also incurred significant costs for investigating the PCCPs' deficiencies and failures.

69.

Due to the deficiencies in the design and construction of the PCCPs, the city of New Orleans is at risk of another flooding event.

**FIRST CAUSE OF ACTION**
**Breach of Contract**

70.

The State incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 11 through 69 of this Complaint.

71.

The State and the Government have a valid and enforceable contract.

72.

In accordance with the terms of the PPA, all aspects of the PCCPs' design and construction are exclusively the obligation, duty, and control of the Government.

73.

The PCCPs were to be designed and constructed with the purpose of pumping water out of the greater New Orleans area during a hurricane event and heavy rain event to protect life and property.

74.

The first pump showed signs of failure and deficiencies within three years of completion. As a result, the pump could no longer fulfill its intended purpose nor meet the requirement of a 35-year life span.  Subsequent investigations of additional pumps within the PCCPs also indicate

deficiencies preventing additional pumps from fulfilling the intended purpose for a 35-year lifespan. The PCCPs do not, and will not, have a total operating capacity of 24,300 cfs as intended and required unless the deficiencies in the pumps are identified, repaired, or replaced.

75.

Additional known deficiencies in the Government's design and construction are related to the climber screens installed on the PCCP Project, tilting of certain pump equipment, as well as sinkholes and basement cracks in certain areas that are part of the PCCP Project.

76.

The Government's design and construction deficiencies render the PCCPs insufficient to perform and fulfill their intended purpose.

77.

The Government has an obligation and duty arising under the PPA to design and construct pumps within the PCCPs without defects and failures. The Government has breached this obligation and duty.

78.

As a result of this breach, the pumps continue to degrade further to the point of failure, causing significant damage to CPRA and putting the residents and property of the greater New Orleans area at risk.

79.

The Government has failed and continues to fail to address the design and construction defects adequately; thus, significant damage continues.

80.

The Government's breach of contractual duties owed to the State is the direct and proximate cause of significant direct and consequential damages. The State has suffered and will continue to suffer as the PCCPs require substantial work to address their design and construction deficiencies. The State, through CPRA, has incurred significant costs investigating the deficiencies.

81.

It is of the utmost importance that the PCCPs are repaired and free from failure and/or defects to protect the citizens and the property of the greater New Orleans area and prevent a significant flooding event.

82.

Due to the Government's breach of the PPA, the State has suffered and will continue to suffer direct and consequential damages of over $100,000,000.00 (One Hundred Million Dollars), the exact amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing

83.

The State incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 11 through 82 of this Complaint.

84.

A covenant of good faith and fair dealing is implied in all contracts. The covenant imposes on a party the duty to do everything that the contract presupposes should be done by a party to accomplish the contract's purposes.

85.

The PCCPs, as contemplated by the parties, include functioning pumps capable of pumping large amounts of water out of the greater New Orleans area in the event of a hurricane and heavy rain event.

86.

The first pump showed signs of failure and deficiencies within three years of completion. The pump could no longer fulfill its intended purpose nor meet the requirement of a 35-year life span.  Subsequent investigations of additional pumps within the PCCPs also indicate deficiencies preventing additional pumps from fulfilling the intended purpose for the intended 35-year lifespan. As a result, the PCCPs do not, and will not, have a total operating capacity of 24,300 cfs as intended and required unless the deficiencies in the pumps are identified, repaired, or replaced.

87.

Additional known deficiencies in the Government's design and construction are related to the climber screens installed on the PCCP Project, tilting of certain pump equipment, as well as sinkholes and basement cracks in certain areas that are part of the PCCP Project.

88.

The Government's design and construction deficiencies render the PCCPs insufficient to perform and fulfill their intended purpose.

89.

The Government breached the implied covenant of good faith and fair dealing by, among other things, (1) failing to perform its obligation to design and construct PCCPs according to the PPA's specifications, resulting in a project riddled with deficiencies causing the pumps to fail and rendering the PCCPs unsuitable for their intended objectives and purposes, and then (2) shifting

responsibility for the PCCP project portion of the Modified Project that was not designed or constructed as contemplated by the parties to CPRA.

### THIRD CAUSE OF ACTION
**Breach of Implied Warranty**

90.

The State incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 11 through 89 of this Complaint.

91.

The Government impliedly warranted to the State in conjunction with the PPA that it would design and construct the PCCPs in a good and workman-like manner, free from defects.

92.

The State relied on the skill and judgment of the Government and the Government's contractors in designing and constructing the PCCPs, as all aspects of the design and construction of the PCCPs were under the Government's exclusive control.

93.

The Government breached the implied warranty by failing to design and construct the PCCPs in a good and workman-like manner free from defects as contemplated by the parties.

### FOURTH CAUSE OF ACTION
**Declaratory Judgment Against the Government**

94.

The State incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 11 through 93 of this Complaint.

95.

On May 1, 2018, the Government issued a final agency decision through a Notice of Construction Completion stating that all contract work was performed per the approved plans and specifications and met the design criteria.

96.

According to the provisions of the PPA, the Notice of Construction Completion triggers legal responsibility to shift the operation and maintenance of the PCCPs from the Government to CPRA.

97.

The State, through CPRA, disputes the Government's assertion that the PCCP Project is complete as it is abundantly clear that the pumps within the PCCPs were not designed nor constructed properly, resulting in a project riddled with deficiencies and unsuitable for its intended purpose. Thus, shifting legal responsibility for the PCCPs from the Government to CPRA was premature, inappropriate, and a breach of the PPA.

98.

The State disputes the Government's contention, implicit in the Government's assertion that the PCCPs are complete, that CPRA is responsible for the deficiencies associated with the design and construction of the PCCPs and any damages resulting therefrom.

99.

The State is irreparably injured and harmed by the Government's determinations that the PCCPs were designed and constructed in accordance with the PPA and that the PCCPs are complete, as under the PPA, such a determination requires CPRA to assume responsibility for operation, maintenance, repair, replacement, and rehabilitation of the PCCPs.

100.

An actual, present, and justiciable controversy exists between the State and the Government regarding whether the design and construction of the PCCPs are complete in accordance with the PPA whether the PCCPs are complete so as to warrant a shifting of responsibility from the Government to CPRA for the operation, maintenance, repair, replacement, and rehabilitation; and whether CPRA bears any responsibility for repairing the deficiencies associated with the design and construction of the PCCPs and any damages resulting therefrom.

101.

The State has no adequate remedy at law for the injury and harms the Government's determination that the PCCPs are "complete" will cause. Accordingly, only the Court's exercise of its equitable powers can determine that the Government's decision of completeness should be set aside and require the Government again to assume responsibility for the PCCPs under the PPA until the PCCPs are, in fact, complete.

102.

The State is entitled to a declaration that the design and construction of the PCCPs were not complete in accordance with the PPA; does not warrant a shifting of responsibility to CPRA for the operation, maintenance, repair, replacement, and rehabilitation; and that the Government is responsible for repairing the deficiencies associated with the design and construction of the PCCPs and any damages resulting therefrom.

## FIFTH CAUSE OF ACTION
### Violation of the Administrative Procedures Act

103.

The State incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs 11 through 102 of this Complaint.

104.

A party has standing to sue under the APA when two requirements are met. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 882–83, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). First, plaintiffs "must identify some 'agency action,'" which is the basis for judicial review. *Id.* at 882, 110 S.Ct. 3177. The APA defines "agency action" to include "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). When the judicial review sought is "under the general review provisions of the APA, the 'agency action' in question must be a 'final agency action.'" *Lujan,* 497 U.S. at 882, 110 S.Ct. 3177 (quoting 5 U.S.C. § 704). Second, plaintiffs must show they have " 'suffer[ed] legal wrong' because of the challenged agency action" or that they have been " 'adversely affected or aggrieved' by that action 'within the meaning of a relevant statute.' " *Id.* at 883, 110 S.Ct. 3177 (quoting 5 U.S.C. § 702).

105.

The APA waives sovereign immunity for lawsuits against agencies and officials of the United States, including the Government. 5 U.S.C. §§ 701(b)(1), 702 and 704.

106.

On May 1, 2018, the Government issued a Notice of Construction Completion. The Notice of Construction Completion triggers legal responsibility to shift the operation and maintenance of the PCCPs from the Government to CPRA. The Notice of Construction Completion is a final agency decision subject to judicial review.

107.

The State has suffered a legal wrong due to the Government's action and has been adversely affected by that final agency action.

108.

The State disputes the Government's assertion that the PCCP Project is complete as it is abundantly clear that the pumps within the PCCPs were not designed nor constructed properly, resulting in a project riddled with deficiencies and unsuitable for their intended purpose. Thus, shifting legal responsibility for the PCCPs from the Government to CPRA was premature, inappropriate, and a breach of the PPA.

109.

The Government's determination, contained in the Notice of Construction Completion, constitutes final agency action subject to judicial review. 5 U.S.C. §§ 702, 704.

110.

Considering the Government's obligation under the PPA to design and build the PCCPs free from defects, as well as the Government's acknowledgment of the deficiencies associated with the design and construction of the PCCPs, the Government's determination that the PCCPs were designed and constructed in accordance with the PPA and are complete is arbitrary, capricious, and an abuse of discretion, and otherwise not in conformance with the law.

111.

The State is irreparably injured and harmed by the Government's determinations that the PCCPs were designed and constructed in accordance with the PPA and that the PCCPs are complete as, under the PPA, such a determination requires CPRA to assume responsibility for operation, maintenance, repair, replacement, and rehabilitation of the PCCPs.

112.

The State has no adequate remedy at law for the injury and harms the Government's determination that the PCCPs are "complete" will cause.

113.

The State requests judicial review of the Government's final agency action, specifically the determination by the Government that the design and construction of the PCCPs under the PPA are complete and that the responsibility for operation, maintenance, repair, replacement, and rehabilitation shifted to CPRA.

114.

The State desires the Government's final agency action and determination to be set aside by the court.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, The State prays for relief as follows:

a)   Compensatory damages are not fully ascertained but are believed to be over $100,000,000.00 (One Hundred Million Dollars), the exact amount to be proven at trial.

b)   A declaration that the design and construction of the PCCPs were not completed in accordance with the PPA;

c)   A declaration that the Government's determination that the PCCPs are complete and legal responsibility should be transferred to CPRA is arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law;

d)   A declaration that CPRA is not responsible for the operation, maintenance, repair, replacement, or rehabilitation of the PCCPs in their current condition;

e)   A declaration that the Government is responsible for repairing the deficiencies, physically and financially, associated with the design and construction of the PCCPs and any damage resulting therefrom;

f)  An order prohibiting the Government from turning over the PCCPs to CPRA for operation, maintenance, repair, replacement, or rehabilitation unless and until the Government repairs the deficiencies associated with the design and construction of the PCCPs to meet the required project specifications and any damage resulting therefrom;

g)  Attorney fees, expert witness fees, and other costs incurred herein;

h)  Legal Interest from the date of Judicial Demand; and

i)  Such other and further relief in law and equity.

Respectfully submitted,

Date:  April 29, 2024                    **DUNLAP FIORE, LLC**

By:     /s/ John B. Dunlap III
        JOHN B. DUNLAP III (No. 19431)
        JENNIFER FIORE (No. 28038)
        HUNTER BERTRAND (No. 30181)
        MICHELLE CUMBERLAND (No. 30681)
        ERIN FONACIER (No. 33861)
        6700 Jefferson Hwy, Building #2
        Baton Rouge, LA 70806
        Telephone: (225) 282-0660
        Facsimile: (225) 282-0680
        Email:
                jdunlap@dunlapfiore.com
                jfiore@dunlapfiore.com
                hbertrand@dunlapfiore.com
                mcumberland@dunlapfiore.com
                efonacier@dunlapfiore.com


        **LIZ MURRILL**
        **ATTORNEY GENERAL**
        David A. Peterson (#22591)
        Ryan M. Seidemann, Ph.D. (#28991)
        Assistant Attorneys General
        Louisiana Department of Justice
        Civil Division
        P.O. Box 94005
        Baton Rouge, Louisiana 70821

29

Telephone: (225) 326-6000
Facsimile: (225) 326-6099
Email:
       petersond@ag.louisiana.gov
       seidemannr@ag.louisiana.gov

*Attorneys for Plaintiff, the State of Louisiana through the Coastal Protection and Restoration Authority Board and the Coastal Protection and Restoration Authority*